R. C. Owen Company (a Tennessee corporation) v. Commissioner.
R. C. Owen Co. v. Commissioner
Docket Nos. 1105-62, 4039-63.
United States Tax Court
T.C. Memo 1964-97; 1964 Tax Ct. Memo LEXIS 239; 23 T.C.M. (CCH) 585; T.C.M. (RIA) 64097; April 15, 1964
William Waller, American Trust Bldg., Nashville, Tenn., and Robert G. McCullough, for the petitioner. William F. Franklin, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioner's income tax for the fiscal years ending April 30, 1961, and April 30, 1962, in the respective amounts of $14,560 and $25,306.66. The principal question presented for decision is whether a prior adjudication by the United States Court of Claims, to which certiorari was denied by the Supreme Court (363 U.S. 819 (1960)), involving petitioner's tax liability for the fiscal years 1953-1955, forecloses the litigation on the merits herein of the issues tendered by the pleadings. Findings of Fact Most of the facts necessary for a resolution of *240 the above issue have been stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by this reference. Among the stipulated exhibits is a copy of the prior adjudication in the Court of Claims. The parties have agreed, and we so hold, that the findings of fact in that case, R. C. Owen Company v. United States, 180 F. Supp. 369 (1960), shall be treated as facts in the instant case without further proof. R. C. Owen Company (hereinafter referred to as petitioner) is a Tennessee corporation having its principal place of business in Gallatin, Tennessee. Its Federal income tax returns for the fiscal years ending April 30, 1961, and April 30, 1962, were filed with the district director of internal revenue, Nashville, Tennessee. Petitioner was organized on October 19, 1946, to acquire, and on December 1, 1946, did acquire, the family partnership of R. C. Owen, Manufacturers of Tobacco, the partners being R. C. Owen and his two sons, R. C. Owen, Jr., and Roy Owen. The interest of the father in the partnership was 72 percent and that of the two sons was 14 percent each. In return for the business and assets of the partnership, petitioner *241 issued to the partners 35,000 shares of common stock of the par value of one dollar per share and $800,000 of Three and One-Half Percent Debenture Bonds, the stock and debentures being issued to the partners in exactly the same proportion as their interests had been in the partnership. The debentures were expressly subordinated and secondary to all indebtedness incurred by petitioner, there being the recital in the debentures that: By the acceptance of this Debenture Bond, the holder hereof, for himself and all subsequent holders expressly agrees that this Debenture Bond shall be subject and secondary to any and all indebtedness incurred by R. C. Owen Company, to banks or to others in the ordinary course of business. This subordination shall cease when surplus equals the amount of these Debenture Bonds. Other pertinent provisions of the debentures are as follows: Until the entire amount of Debenture Bonds of this series are paid in full, R. C. Owen Company covenants and agrees not to mortgage, pledge, or place any lien on any property of the company to secure indebtedness, other than notes for deferred purchase price of realty or personalty secured by a lien on the property purchased *242 or retention of title of personalty, and that it will maintain net current assets in the amount of $400,000, or fifty per cent of the outstanding Debenture Bonds, whichever amount is smaller. The placing of a lien in violation of this agreement or failure to maintain net current assets as herein provided, constitutes an event of default. * * * Any and all provisions and agreements of this Debenture Bond, insofar as they affect the holders hereof, may be changed, altered, or amended by a vote in writing of the holders of these Debenture Bonds holding seventy-five per cent of the principal amount thereof. To accomplish this, a writing shall be executed, signed by at least seventy-five per cent of said holders and filed with the Company, and thereupon, the Company is authorized and empowered to execute new Debenture Bonds in exchange for the outstanding Debenture Bonds, with the alterations or amendments as provided in said instrument. In the event R. C. Owen Company fail to pay interest on this Debenture Bond when due, or commit any other event of default hereinabove set out, then and in such event, and after thirty (30) days' notice in writing to the Company of the existence of *243 the default, the holders of 75% in amount of Debenture Bonds then outstanding may declare the entire series of Debenture Bonds due and payable by a notice in writing to the Company, and such declaration shall mature all outstanding Debenture Bonds, with the same effect as if they had matured by lapse of time. There has been no default, since all payments on the debentures have been made when due. However, with the sole exception of an $8,750 distribution during the fiscal year ending April 30, 1961, no dividends have ever been paid on the common stock. [1]
In November 1947, after petitioner had been functioning for about a year, R. C. Owen, chairman of the board of directors, made an exchange with the two sons, giving 4,000 shares of the one dollar par value common stock to each in return for $4,000 *244 of debentures from each son. On December 1, 1947, R. C. Owen transferred his remaining 17,200 shares of stock to trustees for the benefit of his six children, filing a gift tax return representing that the shares of stock were valued at one dollar per share, their par value. The trust deed was irrevocable and by it R. C. Owen completely divested himself of voting rights and all other control of this stock. After this transaction R. C. Owen owned $584,000 of the $800,000 of debentures but he owned no formal stock whatever. Nevertheless, he continued to serve as chairman of the board of directors of petitioner until several months prior to his death in 1961. On May 27, 1961, R. C. Owen died. In the following year, on April 19, 1962, petitioner retired a portion of its Debenture Bonds, then held by the estate of R. C. Owen, in the face amount of $300,000 for a price of $270,000. Soon thereafter the remainder of the outstanding Debenture Bonds were converted into a new Class B common stock pursuant to an amendment in petitioner's charter authorized by the directors and stockholders and consented to by the debenture holders. During the fiscal years ending April 30, 1961, and April 30, 1962, petitioner *245 deducted as interest expense the sum of $46,666.66 paid by it to its debenture holders in those years. Respondent disallowed the claimed deductions on the ground that the same did not constitute "an allowable deduction under section 163 of the Internal Revenue Code of 1954." R. C. Owen Company v. United States, 180 F. Supp. 369 (Ct. Cl. 1960), certiorari denied 363 U.S. 819 (1960), was a proceeding instituted by petitioner herein as plaintiff in the Court of Claims contesting a determination by the Commissioner that it was not entitled to deductions claimed and taken in each of three fiscal years, 1953, 1954 and 1955, as interest paid on certain of its securities called debentures, because the so-called debentures did not represent bona fide indebtedness, and the payments thereon were not deductible as interest. The "securities called debentures" which were involved in the Court of Claims case are the same Debenture Bonds which form the controverted subject matter of the instant case. In sustaining the Commissioner's determination for the fiscal years 1953-1955 that these Debenture Bonds did not represent bona fide indebtedness *246 and that the payments thereon did not constitute deductible interest, the Court of Claims observed the following: It is true that the securities here under consideration have some of the indicia of evidences of debt. The securities are denominated as debentures, they have a fixed interest rate, and a fixed maturity date. However, they have numerous other characteristics more indicative of contributions to capital, i.e., capital stock. In the first place, no money was loaned to the corporation by the receipients of the debentures nor did the partners pay anything to the corporation for the debentures. They were issued to the partners in precisely the same proportion as their respective interests in the partnership. No preferred stock was issued. The debentures were specifically made "subject and secondary to any and all indebtedness incurred" by the corporation, a characteristic of common stock. The holders of the debentures acquired certain voting rights not ordinarily characteristic of debentures. For instance, in the event of default by the corporation, only upon the vote of 75% in amount of the debentures can the debentures be declared due and payable. Also, there is the specific *247 provision that "all provisions and agreements" of the debentures, "insofar as they affect the holders hereof, may be changed, altered or amended by a vote in writing by the holders of these Debenture Bonds holding 75% of the principal amount thereof." There follows a provision that, following notification of a vote for a change or alteration, the "Company is authorized and empowered" to issue new debentures embodying the change. At the least, these provisions give certain important voting rights to the debenture holders. Although it may be that the entire provision only empowers 75% in amount of the debenture holders to make changes and alterations with the agreement of the corporation, it might well be contended that, by an affirmative vote of 75% in amount of the debenture holders, the provisions of the debentures may be changed at will, even to the extent of increasing the interest rate or accelerating the maturity. If such be the case, the holders of the debentures would have almost as much control of the corporation as common stockholders. Exclusion from control of the affairs of the corporation is an important factor to be considered. Other than as suggested above, the debenture *248 holders, by the terms of the debentures, are excluded from control. However, it seems most noteworthy that the father, R. C. Owen, principal owner of the business, after he had completely divested himself of his holdings of stock by the execution of the trust deed in December 1947, continued to be chairman of the board of directors, although he only owned debentures and no stock at all. So it would seem that, by the terms of the debentures, R. C. Owen, as holder thereof, was excluded from control, but actually, he was very much in control, although his entire stake in the business was in the form of debenture ownership. * * *
Under all the circumstances, it seems clear to us that the $800,000.00 represented by so-called debentures, in the formation of the corporation, definitely constituted contributions to capital, or capital investments on the part of the partners, rather than indebtedness. Hence, the periodic payments to the debenture holders were not deductible as interest on indebtedness. By his answer herein respondent raised the defense of collateral estoppel on the ground that the same issue present here was also present and litigated in the earlier proceeding. *249 Opinion This case involves petitioner's income taxes for the fiscal years 1961 and 1962. In the earlier proceeding in the Court of Claims which covered the fiscal years 1953, 1954, and 1955 there was presented the identical issue which is here raised by petitioner for 1961 and 1962. In substance that issue, both in the present case and in the prior case, is whether the $800,000 represented by petitioner's Debenture Bonds constituted a bona fide loan giving rise to a valid indebtedness or whether it constituted merely a contribution to capital made by the partners upon petitioner's formation. The Court of Claims concluded that the $800,000 was a contribution to petitioner's capital and that therefore the annual payments made to the holders of petitioner's so-called Debenture Bonds were not deductible as interest on indebtedness. As we view it, the present case is merely an attempt to relitigate for the years 1961 and 1962 the identical issue decided by the Court of Claims in the prior proceeding. There is thus involved a classic situation for the application of the doctrine of collateral estoppel. Collateral estoppel, or estoppel by judgment as it is sometimes referred to, applies *250 in a different cause of action and precludes relitigation of issues which were presented, litigated, and decided in a prior proceeding between the same parties, or persons claiming through them. Cromwell v. County of Sac, 94 U.S. 351 (1876). The doctrine is grounded upon the theory that litigation of identical issues in more than one action between the same parties serves no useful purpose, but rather tends to defeat the ends of justice. While collateral estoppel is frequently involved in tax litigation, it does, within this context, have certain limitations which must carefully be kept in mind. As the Supreme Court observed in Commissioner v. Sunnen, 333 U.S. 591 (1948): * * * It must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. * * * If the legal matters determined in the earlier case differ from those raised in the second case, collateral estoppel has no bearing on the situation. * * * And where the situation is vitally altered between the time of the first judgment and the second, *251 the prior determination is not conclusive. * * * [Moreover,] a judicial declaration intervening between the two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable. * * *
[In other words] Before a party can invoke the collateral estoppel doctrine * * *, the legal matter raised in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment. It is petitioner's postion that these limitations preclude the application of collateral estoppel to the instant case. Without a doubt the matter raised in this proceeding, viz., whether petitioner's Debenture Bonds represent a bona fide indebtedness or whether they evidence merely a proprietary equity, is identical with that decided in the first suit. What is therefore at issue here is whether "the controlling facts and applicable legal rules" upon which the Court of Claims based its decision in the earlier case have remained unchanged. The meaning of the term "controlling facts" with respect to the matter raised herein and in the prior proceeding are those facts which surrounded *252 the transfer of the partnership assets to petitioner upon its formation and the concomitant issuance by petitioner of the controverted Debenture Bonds. These controlling facts, from which the Court of Claims drew its ultimate conclusion concerning the nature of the debentures, had already been fixed at the time that Court's determination was made and they are the same unchanged facts which would control a decision on the merits herein. Moreover, the determination of the Court of Claims, to disallow the claimed interest deduction for the fiscal years 1953-1955, was predicated by and large upon its construction of the debentures themselves. This proceeding involves that "same set of * * * documents," unchanged in any degree. When these documents - which possessed some of the indicia of debt but contained other characteristics more indicative of capital stock - were issued their character was cast. The $800,000 which such documents purported to represent was found in fact to be a contribution to capital. We are not persuaded that such a capital contribution could, by the philosophers' store of a dividend distribution in 1961, be transmuted into a loan for tax purposes. In the absence *253 of an intervening recapitalization - to paraphrase Gertrude Stein - a capital contribution is a capital contribution is a capital contribution. Nor do we think that there has been any "change [in] the legal atmosphere" between the prior proceeding and the instant one which "makes manifest the error of the result reached in" the earlier case. Sunnen, supra, at p. 603. Without passing upon the validity of petitioner's contention that there has been "a trend toward greater liberality to taxpayers in this type of case," we observe simply that were a decision on the merits called for herein, we would today apply that "same bundle of legal principles that contributed to the rendering of the first judgment" in the Court of Claims. Accordingly, we find that the deductibility of payments made by petitioner to the holders of its Debenture Bonds during the taxable years here involved is controlled by the prior decision of the Court of Claims characterizing such Debenture Bonds as in the nature of capital stock rather than bona fide indebtedness. Decision will be entered under Rule 50. Footnotes
1. Although as adjusted (in a manner more fully detailed in the stipulation of facts herein) petitioner had earned surplus for the fiscal years 1956-1962 in the following amounts: ↩
Fiscal Year End-
Adjusted Earned
ing April 30
Surplus
1956
$490,843.13
1957
498,951.60
1958
$520,028.34
1959
538,605.61
1960
580,170.23
1961
620,342.95
1962
716,189.73